1
2
3
4
5
6
7
8
# UNITED STATES DISTRICT COURT

9
### EASTERN DISTRICT OF CALIFORNIA

10

DIANE L. STOFFAN,

11
        Plaintiff,

Case No. 1:16-cv-01654-SKO

12
    v.

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

13
NANCY A. BERRYHILL,

14
Acting Commissioner of Social Security,[1]

15
        Defendant.

(Doc. 1)

16

17
_____/

18

19
## I.    INTRODUCTION

20
      On November 1, 2016, Plaintiff Diane Stoffan ("Plaintiff") filed a complaint under 42

21
U.S.C. §§405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner of

22
Social Security (the "Commissioner" or "Defendant") denying her application for Disability

23
Insurance Benefits ("DIB"). (Doc. 1.) The matter is currently before the Court on the parties'

24
briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United

25

26

27
[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of the Social Security Administration. *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on February 27, 2017). She is therefore

28
substituted as the defendant in this action. *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

States Magistrate Judge.[2]

## II.     BACKGROUND

On December 9, 2013, Plaintiff filed an application for DIB, alleging that she became disabled on July 9, 2013, due to chronic nerve pain, as well as pain in her back, shoulders, and legs. (Administrative Record ("AR") 16, 87, 189.) Plaintiff was 52 years old when she filed the application. (AR 41, 173 (listing Plaintiff's date of birth as November 13, 1961).) She graduated from high school and received vocational training as a medical assistant/pharmacy technician. (AR 190.) Plaintiff worked as medical insurance claim examiner from January 1996 to October 2006, and as a pharmacy technician from May 2008 to January 2012. (AR 191, 196.)

### A.     Relevant Medical Evidence[3]

#### 1.     Hospitalization

On several occasions between June 2013 and October 2015, Plaintiff was hospitalized for inpatient treatment. Particularly, on June 4, 2013, Plaintiff presented at Sutter Amador Hospital's emergency room with complaints of syncopal episodes, dizziness, weakness, and lightheadedness. (AR 279-91, 301.) She was found to be hypoxemic with only 73 per cent on room air and to suffer bilateral pneumonia. (AR 289-91.) She was ultimately admitted and hospitalized for eleven days. (AR 279.) For the first four days of her hospitalization, Plaintiff required ventilator support as a result of respiratory failure. (AR 279.) She was diagnosed with respiratory failure, septic shock, bilateral pneumonia, leukocytosis, hypotension, opiate dependence, history of tobacco use, and debility. (AR 279.)

On June 20, 2013, Plaintiff again presented at Sutter Amador Hospital's emergency room, and was hospitalized for five days for acute respiratory failure, acute renal failure, anemia, probable congestive heart failure, hypotension, septic shock, and pneumonia. (AR 305-17.) On the second day of her hospitalization, a cardiologist evaluated Plaintiff, and found that "due to the

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 4, 6.)
[3] Plaintiff's assertions of error are limited to the following: (1) the ALJ's finding that Plaintiff's impairments of syncope, dizziness, confusion, weakness, and altered mental status were not severe; (2) the ALJ's alleged failure to consider the limitations associated with these impairments as part of the RFC assessment; (3) the ALJ's alleged failure to consider the side effects caused by Plaintiff's medication; and (4) the ALJ's rejection of treating physician William Trusnovic's medical opinion,. Only evidence relevant to those arguments is considered below.

large doses of opiates that she takes, she is probably aspirating at home which then led to a pneumonia with septic shock. . . . She then became, as a result of the pneumonia, hypoxic, and had a rise in the troponin." (AR 313.) Plaintiff's symptoms improved, but she continued to need oxygen. (AR 308-17.) The day Plaintiff was discharged, she was instructed to not use "tobacco ever," and to begin home therapy. (AR 306-07.)

On July 27, 2013, Plaintiff returned to Sutter Amador Hospital's emergency room, complaining of confusion, slurred speech, extreme fatigue, and dizziness. (AR 327.) Plaintiff was found to be hypotensive and her tests revealed multiple metabolic abnormalities. (AR 325.) Plaintiff was hospitalized overnight and rehydrated with IV fluid. (AR 325.) Plaintiff was diagnosed with hypotension, altered mental status, opiate dependence, acute kidney failure, abnormal liver enzymes, chronic pain syndrome, and a right ankle fracture. (AR at 325-36.)

On May 19, 2015, Plaintiff presented at Regional Medical Center of San Jose with complaints of altered mental status. (AR 500-01, 535.) An MRI showed stones in Plaintiff's gallbladder, but a CT scan of Plaintiff's head revealed no acute abnormality, and an x-ray revealed no evidence of acute pneumonia. (AR 500.) Plaintiff was hospitalized for three days during which time her symptoms progressively improved. (AR 500.) Plaintiff was diagnosed with altered mental status and etiology not otherwise specified. (AR 500-01.)

### 2. William D. Trusnovic, M.D.

On July 9, 2013, following her June 2013 hospitalization, Plaintiff established primary care with William D. Trusnovic, M.D. (AR 377-81.) Dr. Trusnovic observed that Plaintiff was in no acute distress, her overall appearance was non-toxic, her respiratory effort was normal, she displayed a normal level of consciousness, and she had no motor weakness. (AR 377-81.) Dr. Trusnovic found improvement in Plaintiff's symptoms related to pneumonia, respiratory failure, sepsis, and renal failure. (AR 377, 381.)

Dr. Trusnovic examined Plaintiff four more times over the subsequent nine months. On July 19, 2013, Dr. Trusnovic noted that Plaintiff was positive for nocturnal pain, nocturnal waking, and various other pains, but she was negative for muscle weakness and depression. (AR 374.) Plaintiff reported that the symptoms related to pneumonia had improved: she was no longer

experiencing fatigue or shortness of breath.  (AR 373.)

On August 16, 2013, Plaintiff was positive for snoring and various types of pain.  (AR 367.)  Plaintiff was negative for fatigue, symptoms related to her respiratory effort, and depression.  (AR 367.)  Dr. Trusnovic recommended that Plaintiff stop breathing treatment, given her improvement, stop smoking, begin pain treatment, undergo an excisional biopsy, and restart Lisinopril.  (AR 368.)

On October 1, 2013, Plaintiff was positive for decreased mobility, joint tenderness, weakness, nocturnal pain, and difficulty initiating sleep.  (AR 364.)  Plaintiff was negative for depression.  (AR 364.)  Dr. Trusnovic counseled Plaintiff on disease management, rehabilitation techniques, including the use of exercise bands, and he referred Plaintiff for physical therapy and orthopedic surgery.  (AR 365.)

On October 9, 2013, Dr. Trusnovic submitted an opinion regarding Plaintiff's residual functional capacity.  (AR 385.)  He indicated that Plaintiff is able to walk four city blocks without rest or severe pain, sit for ten minutes, stand for fifteen minutes, and sit and stand for less than two hours in an eight-hour work day.  (AR 386.)  Plaintiff will need to take a fifteen- to twenty-minute unscheduled break twice an hour during an eight-hour work day due to her pain and the side effects of her medication.  (AR 386.)  Plaintiff can occasionally lift less than ten pounds, and can never lift more than ten pounds.  (AR 387.)  Plaintiff has no significant limitations reaching, handling, and fingering, can occasionally climb stairs, can rarely twist, and can never stoop, crouch, and climb ladders.  (AR 387.)  Plaintiff is capable of tolerating moderate stress in the work place.  (AR 388.)  Dr. Trusnovic concluded that Plaintiff is likely to be absent from work more than four days per month.  (AR 388.)

On April 4, 2014, Plaintiff reported a worsening of her depression.  (AR 431.)  She reported difficulty functioning, concentrating, initiating and maintaining sleep, fatigue, and diminished pleasure.  (AR 431.)  However, Dr. Trusnovic noted that Plaintiff responded well to medication, particularly fluoxetine.  (AR 431.)  Plaintiff was positive for irritability, nocturnal pain, anxiety, difficulty concentrating, decreased mobility, weakness, initiating sleep, and maintaining sleep.  (AR 432.)

### 3. Karen Pantazis, M.D.

On September 12, 2013, Plaintiff underwent a new patient pain management evaluation with Karen Pantazis, M.D. for her chronic lower back pain and leg pain. (AR 392; *see also* AR 368.) Dr. Pantazis observed that Plaintiff's had an abnormal gait, normal balance, diminished posture. (AR 393-96.) Plaintiff had a full range of motion of the cervical spine without tenderness, and a full range of motion of the upper extremities. (AR 393-96.) However, Plaintiff had a diminished range of motion of the lumbar spine and the lower extremities. (AR 393-96.)

On October 10, 2013, Plaintiff returned to Dr. Pantazis to follow up about her lumbar spine and leg pain. (AR 397.) Plaintiff was negative for shortness of breath, but reported general pain and depression. (AR 399.) Plaintiff was stable on her medication. (AR 397.) Dr. Pantazis recommended that Plaintiff receive smoking cessation therapy. (AR 400.) On November 26, 2013, Dr. Pantazis assessed that Plaintiff remained stable on her medication. (AR 402.)

On December 11, 2013, Plaintiff received a lumbar epidural steroid injection. (AR 407.) When Plaintiff returned on December 20, 2013, Plaintiff reported that she experienced 50 percent relief from her lumbar spine and leg pain, and that she was able to be more active and to reduce her pain medication. (AR 408.)

On February 18, 2014, Plaintiff reported experiencing good relief from her pain as a result of the epidural steroid injection. (AR 439.) Plaintiff stated that she overexerted herself and was experiencing some pain as a result, and requested another epidural steroid injection. (AR 439.) Plaintiff received an epidural steroid injection on March 26, 2014, and, on April 17, 2014, Plaintiff reported experiencing 30-50 percent relief from her pain and improved function. (AR 444.)

Finally, on June 18, 2014, Plaintiff reported an increase in her pain since her visit in April 2014. (AR 449.) Plaintiff admitted to Dr. Pantazis that she had been overdoing activities and overexerting herself, and requested more epidural steroid injections. (AR 449.) Plaintiff received an epidural steroid injection on July 16, 2014. (AR 478.)

//

//

### 4. Poonam Duggal, M.D.

On April 19, 2014, Plaintiff underwent an internal medicine evaluation with Poonam Duggal, M.D. (AR 491.) Dr. Duggal observed that Plaintiff ambulated without assistance, climbed on and off the exam table without assistance, opened the door without assistance, and picked up fine objects. (AR 493.) Dr. Duggal found that Plaintiff's chest was clear to auscultation with no rales and ronchi. (AR 493.) While Plaintiff's range of motion at the cervical spine, lumbar spine, and shoulders was slightly reduced, she had a normal range of motion at the hips, knees, ankles, elbows, and wrists. (AR 493-94.) Plaintiff had some mild scoliosis in the lower thoracic area with curvature toward the left. (AR 494.) She had straight leg raises in the seated and supine positions bilaterally. (AR 494.) Her motor strength, muscle bulk and tone were found to be essentially unremarkable; her sensation to light touch and pinprick in the upper and lower extremities was intact; and her deep tendon reflexes in the upper and lower extremities were normal. (AR 494.) Dr. Duggal diagnosed Plaintiff with diet-controlled diabetes, hypertension, chronic low back pain, and history or cervical and lumbar degenerative joint disease with mild knee degenerative joint disease. (AR 494.)

With regard to Plaintiff's functional limitations, Dr. Duggal opined that Plaintiff was able to stand for four to six hours in an eight-hour work day with frequent breaks, she was able to sit up to six hours in an eight-hour work day, and she needed no assistive device. (AR 495.) Dr. Duggal further opined that Plaintiff could lift up to 30 pounds occasionally and ten to fifteen pounds frequently. (AR 495.) Dr. Duggal found Plaintiff had occasional limitations on her ability to climb, kneel, crouch, crawl, and stoop, but no limitations on her ability to balance, manipulate, and manage workplace environmental activities. (AR 495.)

### 5. Robert Rose, M.D.

From February 2015 through January 2016, Plaintiff received primary care treatment from Robert Rose, M.D. (*See generally* AR 602-68.) During that period, Dr. Rose treated Plaintiff for syncope, chronic obstructive pulmonary disease ("COPD"), depression, and chronic pain. (*Id.*) Dr. Rose observed that Plaintiff was in no acute distress, appeared healthy, had good air movement, and ambulated normally. (*Id.*)

### 6. Kalyan Kosuri, M.D.

On January 19, 2016, at the request of Dr. Rose, Plaintiff was evaluated by Kalyan Kosuri, M.D. regarding her COPD. (AR 682.) Dr. Kosuri observed that Plaintiff was in no acute distress, appeared well-nourished and well-developed, was clear to auscultation bilaterally, and exhibited intact sensation and normal motor strength at the upper and lower extremities. (AR 682-83.) Dr. Kosuri diagnosed Plaintiff with shortness of breath, and recommended Plaintiff take a six-minute walk test. (AR 683.)

### 7. State Agency Physicians

On April 30, 2014, P. Frye, M.D., a state agency physician, assessed Plaintiff's residual functional capacity ("RFC")[4] and found that Plaintiff was able to perform light work. (AR 75-85.) In particular, Dr. Frye found that Plaintiff could frequently reach overhead, push, and pull with the upper left extremity, and could occasionally balance, stoop, kneel, crouch, crawl, and climb. (AR 75-85.)

On October 15, 2014, R. Fast, M.D., a state agency physician, issued an opinion affirming Dr. Frye's opinion. (AR 98.) Dr. Fast opined that Plaintiff could occasionally lift up to twenty pounds, and could frequently lift up to ten pounds. (AR 97.) Dr. Fast further found that Plaintiff could stand or walk about six hours in an eight-hour work day, and sit about six hours in an eight-hour work day. (AR 97.)

## B. Administrative Proceedings

The Commissioner denied Plaintiff's application for DIB initially on May 1, 2014, and again on reconsideration on October 17, 2014. (AR 16, 86, 102.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 120-21.) At the hearing on March 8, 2016, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions. (AR 16, 41-64.)

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

### 1.    Plaintiff's Testimony

Plaintiff testified that she suffers mostly from pain in her back, and that she suffers leg pain related to her lower back radiculopathy.  (AR 44, 47.)  The pain is worst when Plaintiff stands, is moderately better when she sits, and dissipates when she lies down.  (AR 45.)  At the time of the hearing, Plaintiff was taking prescription medication for her back pain, and she stated that the medication helped take the edge off the pain "[t]o some extent."  (AR 45.)  Plaintiff testified that she was not receiving physical therapy at the time of the hearing.  (AR 45.)  She received physical therapy in the past, but it did not help with her back pain.  (AR 45.)  Plaintiff also received epidural injections, which helped with the pain "[f]or maybe about a month at a time."  (AR 46.)  Plaintiff underwent surgery on her lower back to remove a bone spur, and, although the pain improved immediately after, ultimately it worsened.  (AR 46.)  Plaintiff has not since been recommended for surgery—in fact, according to Plaintiff, her doctors cautioned against surgery, given her age and the amount of physical therapy she would have to undergo.  (AR 47.)  Plaintiff has never been treated by a chiropractor, does not wear a back brace, and she was not on a home exercise program to manage her back pain.  (AR 46, 48.)

Plaintiff testified that she also suffers shoulder pain, arthritis in her shoulders and back, and numbness in her hands.[5]  (AR 48-50, 63.)  To manage her shoulder pain, Plaintiff exercises with a resistance band at home as the pain arises, and the exercising helped improve her symptoms.  (AR 48-49.)  At the time of the hearing, Plaintiff was receiving no treatment or therapy for the numbness in her hands, and she testified that she experiences numbness only if she overuses her hands.  (AR 63-64.)

Plaintiff complained of respiratory problems, and testified that she was diagnosed with COPD by some doctors and asthma by others.  (AR 50.)  She had also been experiencing fainting spells since 2013 related to her low oxygen.  (AR 51, 54.)  Plaintiff used oxygen to manage her respiratory problems—only at night prior to October 2013, and at all times of the day thereafter.  (AR 50-51.)  Plaintiff testified that she recently began treatment with a

---

[5] Plaintiff testified that several years ago she underwent successful gastric bypass surgery and gallbladder surgery, and that she experienced no resultant complications.  (AR 49, 53.)  Plaintiff also testified that her diabetes was in remission as a result of her weight loss.  (AR 49.)

pulmonologist. (AR 50.) Plaintiff also testified that, although she continued smoking cigarettes, she had reduced her usage from one-and-a-half packs per day to one pack per day. (AR 51.) She was not receiving treatment for her fainting spells, because her pulmonologist had not yet identified the root cause. (AR 52.)

With regard to her mental impairments, Plaintiff testified that she suffered from anxiety and depression. (AR 53.) She was taking Paxil to manage both, but she was not otherwise receiving treatment from a psychiatrist or counseling. (AR 53.)

Plaintiff lives with her husband and their three dogs, but her husband is home only on the weekend. (AR 54.) Plaintiff's husband drives her to the grocery store, and Plaintiff uses a motorized cart to shop for groceries. (AR 58-59.) Plaintiff stopped driving when her pain worsened. (AR 54, 55, 57, 60.) Plaintiff does not take public transportation or walk, due to her pain, but she stated that she could walk if needed. (AR 54, 55, 57, 60, 61.) In describing her typical day, Plaintiff testified to the following: she uses a chair to shower; she does not cook on the stove but rather uses the microwave; she washes dishes by hand; she does not take out the garbage; she does not make the bed because it is too heavy; she vacuums but needs to lay down often; she washes only small loads of laundry; she does not read books because they are too heavy; her husband checks email for her; and she does not use her cell phone to text or for the internet. (AR 55-58.) With regard to Plaintiff's social activities, she spends time only with her sister-in-law and her parents when they visit. (AR 60.) Plaintiff testified that, after she was laid off from her job in 2012, she continued to apply for work, but she could not find any available work in the area for pharmacy technicians. (AR 61-62.)

**2.  Vocational Expert's Testimony**

A Vocational Expert ("VE") testified at the hearing that Plaintiff has past work as (1) a claims examiner, Dictionary of Operational Titles ("DOT") code 168.267-014, which was sedentary work, with a specific vocational preparation ("SVP") of 7; and (2) a pharmacy technician, DOT code 074.385-010, which was light work, with an SVP of 3, but with an SVP of 5 as presently performed. (AR 66.)

//

The ALJ asked the VE one hypothetical question, in which the VE was to consider a person of Plaintiff's age, education, and work experience, who can perform work at a light level, including the follow capabilities: standing or walking for approximately six hours during an eight-hour work day; sitting for up to six hours during an eight-hour work day with normal breaks; occasionally climbing a ladder, ropes, scaffolding, ramps, and stairs; occasionally balancing, stooping, crouching, kneeling, and crawling; frequently reaching overhead with the left arm (the non-dominant arm in Plaintiff's case); avoiding concentrated exposure to poorly ventilated areas, and to irritants such as fumes, odors, dust, and gases. (AR 66-67.) The ALJ then asked the VE whether, given this, such a person could perform any of Plaintiff's past work. (AR 67.) The VE testified that such a hypothetical person could perform both of Plaintiff's past jobs as defined by the DOT and as performed. (AR 67.)

The ALJ then asked the VE a second hypothetical question considering the same person with the same capabilities as outlined in the first hypothetical, but who is limited to simple work—defined by the DOT as SVP levels 1 and 2—performing only routine and repetitive tasks. (AR 67-68.) The VE testified that such a person would not be able to perform Plaintiff's past work and would be limited to unskilled work. (AR 68.) Such a person would, however, be able to perform the following light, unskilled jobs: (1) cashier II, DOT code 211.462-010, SVP of 2, for which there exists 1.1 million jobs nationally; (2) mail clerk, DOT code 209.687-026, SVP of 2, for which there exists 70,000 jobs nationally; and (3) office helper, DOT code 239.567-010, SVP of 2, for which there exist 225,000 jobs nationally. (AR 68.)

The ALJ asked the VE a third hypothetical question considering the same person with the same capabilities as outlined in the second hypothetical, but who would be on oxygen the entire time and carry around a backpack containing an oxygen tank. (AR 68.) The VE testified that such limitations would not affect the person's abilities to perform the jobs identified in response to the second hypothetical or in response to the first hypothetical. (AR 69.)

The ALJ posed a fourth hypothetical in which the VE was to consider the same person with the same capabilities as outlined in the first hypothetical, but who can perform sedentary work rather than light work. (AR 69.) The VE testified that such a person could perform

Plaintiff's past work as a claims examiner.  (AR 69.)  The VE further testified, in response to the ALJ, that even if such a person needed to use an oxygen pack, that person could perform the job of a claims examiner.  (AR 69-70.)

The ALJ posed a fifth hypothetical, considering the same person outlined in the fourth hypothetical, but who could perform only simple, repetitive tasks.  (AR 70.)  The VE testified that such a person would not be capable of performing Plaintiff's past work.  (AR 70.)

The ALJ asked a sixth hypothetical, considering the same person outlined in the fourth hypothetical, but who would likely be absent from work three or more times per month.  (AR 70.)  The VE testified that such a person would not be able to perform any of Plaintiff's past work or any other work.  (AR 70.)

The ALJ asked a seventh hypothetical, considering the same person outlined in the fourth hypothetical, but who would need a 10- to 15-minute break every two hours, in addition to regular breaks.  (AR 70.)  The VE testified that such a person would not be able to perform any of Plaintiff's past work or any other work.  (AR 70.)

Finally, the ALJ asked an eight hypothetical, considering the same person outlined in the fourth hypothetical, but who would be unable to perform any sustained work activity on a regular and continuing basis for eight hours a day.  (AR 71.)  The VE testified that such a person would not be able to perform any of Plaintiff's past work or any other work.  (AR 71.)

**C.     The ALJ's Decision**

In a decision dated April 27, 2016, the ALJ found that Plaintiff was not disabled.  (AR 16-29.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920.  (AR 16-17.)  The ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from her alleged disability onset date, July 9, 2013, to the date when she was last insured, December 31, 2015. (AR 18.)

At Step Two, the ALJ found Plaintiff's following impairments to be severe: bursitis, partial tear of the left shoulder, degenerative disc disease of the lumbar and cervical spine, and chronic obstructive lung disease.  (AR 18.)  The ALJ further found, however, that Plaintiff's obesity, gastric bypass surgery, hypertension, diabetes mellitus, gallbladder removal, syncope

episodes, fainting spells, dizziness, confusion, generalized weakness, altered mental states, depression, and anxiety were non-severe. (*See* AR 18-23.) Of particular relevance to the instant matter, the ALJ found the medical evidence to show that Plaintiff's syncope episodes, fainting spells, dizziness, confusion, generalized weakness, and altered mental states only minimally affected Plaintiff's ability to perform basic work activities, despite Plaintiff's repeated hospitalization and visits to the emergency room, which are detailed in the ALJ's decision. (AR 19-20.) That is, these impairments "do not appear to relate to an established diagnosis[,] . . . do not appear to have been made on a consistent basis in the record[,] . . . [and the] diagnosed impairments while hospitalized resolved with appropriate treatment and did not last for twelve continuous months." (AR 20.) Moreover, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). (AR 23.)

At Step Three, the ALJ determined that Plaintiff had the RFC

> to perform sedentary work as defined in 20 CFR 404.1567(a) except she was limited to frequent overhead reaching with the left upper extremity. She was able to occasionally balance, stoop, kneel, crouch, crawl, and climb. The claimant needed to avoid concentrated exposure to poorly ventilated areas and pulmonary irritants such as fumes, odors, dusts, and gases. She needed to be able to use oxygen.

(AR 23.) In determining Plaintiff's RFC, the ALJ considered the statements of Plaintiff's mother and husband, and the medical opinions of treating physicians Dr. Trusnovic, Dr. Pantazis, and Dr. Rose, examining physician Dr. Duggal and Dr. Kosurri, and state agency physicians Dr. Frye and Dr. Fast. (AR 24-28.) The ALJ afforded "greater weight" to the opinions of Dr. Duggal, Dr. Frye, and Dr. Fast than to the opinion of Dr. Trusnovic. (AR 27.) In discrediting Dr. Trusnovic's opinion, the ALJ explained that (1) Dr. Trusnovic had been treating Plaintiff for only three months when he issued his report, (2) his report did not take into account Plaintiff's recovery and improved symptoms as a result of her oxygen treatment, and (3) his report conflicted with the other medical evidence in the record. (AR 27.)

//

Finally, the ALJ found, given Plaintiff's RFC, that she was not disabled because she could perform her past relevant work as a claim examiner. (AR 28.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on August 29, 2016. (AR 1-7.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

## D. Plaintiff's Appeal

On November 1, 2016, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision. (Doc. 1.) Plaintiff contends that the ALJ erred in three respects: (1) the ALJ erred in finding that Plaintiff's impairments of syncope, dizziness, confusion, weakness, and altered mental status were non-severe, and, as a result, failed to consider the limitations associated with those impairments in the RFC analysis; (2) the ALJ failed to consider in his RFC analysis the limitations caused by the side effects of Plaintiff's medications; and (3) the ALJ failed to articulate sufficient reasons for discrediting the opinion evidence of Dr. William D. Trusnovic. (*See generally* Doc. 14 at 6-16.)

## III.      SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts

from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.    APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)–(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities. *Id*. §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id*. §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform his past work. *Id*. §§ 404.1520(f), 416.920(f). If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. §§ 404.1520(g),

416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.  DISCUSSION

Plaintiff contends that the ALJ erred in three respects: (1) the ALJ erred in finding that Plaintiff's impairments of syncope, dizziness, confusion, weakness, and altered mental status were non-severe, and, as a result, failed to consider the limitations associated with those impairments in the RFC analysis; (2) the ALJ failed to consider in his RFC analysis the limitations caused by the side effects of Plaintiff's medications; and (3) the ALJ failed to articulate sufficient reasons for discrediting the opinion evidence of treating physician Dr. William D. Trusnovic.  (*See generally* Doc. 14 at 6-16.)

**A.    Consideration of Plaintiff's Syncope, Dizziness, Confusion, Weakness, and Altered Mental Status**

The ALJ found that Plaintiff's impairments of syncope episodes, dizziness, confusion, weakness, and altered mental status were non-severe, because those impairments did "not appear to relate to an established diagnosis," they did "not appear to have been made on a consistent basis in the record," and they were resolved with treatment.  (AR 23.)  Plaintiff contends that the ALJ failed to consider Plaintiff's hospitalization in October 2015, when she spent five days on a ventilator and two weeks in the ICU.  (Doc. 14 at 7.)  Plaintiff further contends that these impairments were not resolved, as the ALJ found, but rather that Plaintiff was treated for the impairments throughout the course of the medical treatment period contained in the record.  (Doc. 14 at 7-8.)  Finally, Plaintiff contends that, as a result of the ALJ's non-severity error, the ALJ failed to consider the limitations associated with these allegedly non-severe impairments at Step Five.

The Commissioner counters that Plaintiff has confused mere symptoms with severe impairments.  (Doc. 15 at 3.)  While the Commissioner concedes that the ALJ did not expressly discuss Plaintiff's hospitalization, the Commissioner contends that the "ALJ is not required to discuss every piece of evidence," and that the ALJ did in fact consider relevant evidence,

including the notes of Dr. Rose who was treating Plaintiff's pneumonia and breathing problems. (Doc. 15 at 3-4.) The Commissioner further counters that Plaintiff did not testify about any problems related to fainting, dizziness, confusion, weakness, or altered mental status. (Doc. 15 at 4.)

### 1. Legal Standard

At the Second Step, the ALJ must determine whether the claimant has a medically determinable physical or mental impairment or combination of impairments that is severe and that meets the durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii). A medically determinable impairment is one which results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(D); *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 (9th Cir. 2005). A claimant's own statement of symptoms is not enough to establish a medically determinable impairment. 20 C.F.R. §§ 404.1508, 416.908.

An impairment or combination of impairments is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). An impairment is not severe if it is a slight abnormality that has no more than a minimal effect on an individual's ability to do basic work activities. Social Security Ruling ("SSR") 85-28; *see also* SSR 96-3p. The purpose of Step Two is to identify claimants whose medical impairment is so slight that it is unlikely they would be disabled even if age, education, and experience were taken into account. *Bowen v. Yuckert*, 482 U.S. 137 (1987). "The step two inquiry is a *de minimis* screening device to dispose of groundless claims. *Smolen v. Chafer*, 80 F.3d 1273, 1290 (9th Cir. 1996). The burden is on the claimant to demonstrate a severe impairment. *Tackett*, 180 F.3d at 1098.

### 2. The ALJ Did Not Err at Step Two in Finding Plaintiff's Syncope Episodes, Dizziness, Confusion, Weakness, and Altered Mental Status to be Non-Severe.

In finding Plaintiff's impairments of syncope, dizziness, confusion, weakness, and altered mental status to be non-severe, the ALJ cited Plaintiff's rapid improvement as a result of treatment. As the ALJ noted in his decision, Plaintiff "rapidly recovered" during her hospitalization from June 4, 2013, to June 15, 2013, "[a]fter [being] provided with appropriate

treatment . . . [and] physical therapy." (AR 19.)  During her hospitalization from June 20, 2013, to June 25, 2013, Plaintiff "required significant physical therapy and rapidly recovered."  (AR 19.)  During Plaintiff's hospitalization in July 2013, "[s]he was provided with IV fluid rehydration and appropriate treatment and everything stabilized."  (AR 20.)  Plaintiff's "symptomatology [again] resolved progressively during her hospitalization" in May 2015.  (AR 20.)  The ALJ further cited Plaintiff's CT scans on July 2, 2014, May 19, 2015, and October 6, 2015, as "show[ing] no acute abnormality."  (AR 20.)  These were appropriate reasons for the ALJ to find that Plaintiff's syncope, dizziness, confusion, weakness, and altered mental status "[no] more than minimally affected her ability to perform basic work activities for twelve consecutive months."  (AR 19); see also SSR 85-28; *Fry v. Comm'r of Soc. Sec.*, No. 2:15-cv-2023-KJN (PS), 2017 WL 999459, at *3 (E.D. Cal. Mar. 15, 2017) (ALJ properly found plaintiff's plantar fasciitis non-severe where plaintiff acknowledged that condition improved when he used orthotic inserts, and x-rays of plaintiff's feet revealed no abnormalities); *Rudenco v. Astrue*, 2010 WL 3749261, at *8-9 (E.D. Cal. Sep. 23, 2010) (ALJ properly found plaintiff's hypertension, diabetes mellitus, sleep apnea, and shortness of breath to be non-severe because there was minimal evidence of treatment for those impairments and the impairments "completely resolved").

The ALJ's non-severity determination at Step Two is also supported by objective evidence in the record.  *See Braeger v. Astrue*, No. 1:11-cv-01931-JLT, 2012 WL 4985103, at * 8 (E.D. Cal. Oct. 17, 2012) (citing objective medical evidence in the record as supporting ALJ's finding of non-severity).  As noted in the ALJ's decision, Dr. Rose—who treated Plaintiff from February 2015 through January 2016 for syncope, COPD, depression, and chronic pain—consistently observed that Plaintiff was in no acute distress, appeared healthy, had good air movement, and ambulated normally.  (AR 26, 602-68.)  Dr. Kosuri found Plaintiff's "lungs to be clear to auscultation with no wheezes, rales, or rhonchi," and noted that Plaintiff did not use inhalers and used oxygen only as needed and at night.  (AR 26.)  Thus, the ALJ's finding of non-severity was supported by substantial evidence.  *See Matthews v. Shalala*, 10 F.3d 678 (9th Cir.

1993) (determining that "[t]he mere existence of an impairment is insufficient proof of a disability").

//

### 3. The ALJ Did Not Fail to Consider Plaintiff's Syncope Episodes, Dizziness, Confusion, Weakness, and Altered Mental Status at Step Five.

With regard to Plaintiff's claim that the ALJ failed to consider the symptoms related to Plaintiff's syncope, dizziness, confusion, weakness, and altered mental status, Plaintiff misunderstands the function of the Second Step as a gate-keeping mechanism to dispose of groundless claims. Once a claimant prevails at the Second Step by achieving a finding of some severe impairment, regardless of which condition is found to be severe, the ALJ proceeds with the sequential evaluation, considering at each step all other alleged impairments and symptoms that may impact the claimant's ability to work. *See* 42 U.S.C. § 423(d)(2)(B) ("In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.").

Here, Plaintiff prevailed at the Second Step because the ALJ found her impairments of bursitis and partial tear of the left shoulder, degenerative disc disease of the lumbar and cervical spine, and chronic obstructive lung disease to be severe. (AR 19.) Therefore, even if the ALJ committed any error in the Second Step, it would have been harmless because the ALJ found severe impairments and continued with the remaining steps. *See generally Lewis*, 498 F.3d 909 (concluding that the ALJ's classification of one of claimant's impairments as non-severe at the Second Step was harmless error, because claimant was found to have other severe impairments, and the ALJ extensively discussed claimant's non-severe impairment symptoms in the Fourth Step); *Smolen*, 80 F.3d at 1290 (recognizing that, if one severe impairment exists, all medically determinable impairments must be considered in the remaining steps of the sequential analysis). Thus, the question becomes whether the ALJ properly considered the functional

limitations associated with Plaintiff's syncope, dizziness, confusion, weakness, and altered mental status at the remaining steps.

At the Fifth Step, the ALJ was required to account for all of Plaintiff's medically determinable impairments, including those which were non-severe.  *See Smolen*, 80 F.3d at 1290. The ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (AR 24.)  To be sure, the ALJ did consider the symptoms associated with Plaintiff's syncope, dizziness, confusion, weakness, and altered mental status.  In discussing the Third Party Function Report submitted by Plaintiff's husband, the ALJ noted that Plaintiff's husband detailed Plaintiff's "hospitalizations and emergency room visits due [to] pneumonia and decreased oxygen levels, and her depression and memory problems."  (AR 25.)  The ALJ found the statements of Plaintiff's husband "to be generally persuasive except in regards to the severity of [Plaintiff's] impairments . . . ."  (AR 26.)  The ALJ discussed in great detail the findings and opinions of treating physician's Dr. Trusnovic, Dr. Pantazis, and Dr. Rose—particularly concerning Plaintiff's respiratory issues, her "coarse breath sounds," and her "good air movement" related to syncope, dizziness, confusion, and weakness.  (AR 25-26.)  Therefore, the ALJ considered Plaintiff's fibromyalgia in the Fourth Step of his analysis even though he found it to be non-severe.  The ALJ's findings with regard to Plaintiff's syncope, dizziness, confusion, weakness, and altered mental status are therefore supported by substantial evidence.

**B.      Consideration of Medication Side-Effects**

Plaintiff next contends that the ALJ erred by failing to consider the side effects of her morphine dependency and their impact on her ability to work.  (Doc. 14 at 10.)  In detailing her side effects, Plaintiff points to the treatment notes from her hospitalization in June 2013, indicating that "due to the large doses of opiates that [Plaintiff] takes, she is probably aspirating at home which then led to a pneumonia with septic shock. . . . She then became, as a result of the pneumonia, hypoxic, and had a rise in the troponin."  (Doc. 14 at 10 (citing AR 313).)  Plaintiff also points to her testimony from the administrative hearing, stating that her doctors "all seem to think [that her lethargy might be related to home morphine use]."  (Doc. 14 at 10 (citing AR 52).)

As explained above, "[i]n assessing a claimant's RFC, it is necessary to consider the limiting effects of all the claimant['s] impairments, even those that are not severe." *Vargas v. Astrue*, No. 1:06-cv-001148-LJO-SMS, 2008 WL 341574, at *10 (E.D. Cal. Feb. 6, 2008) (citing 20 C.F.R. § 404.1545(a), (e); 20 C.F.R. § 416.945(a), (e); Soc. Sec. Ruling 96-8p at 4; *Reddick v. Chater*, 157 F.3d 715, 724 (9th Cir.1998); *Beecher v. Heckler*, 756 F.2d 693, 694-95 (9th Cir.1985)). "Side effects of prescribed medication may have a significant effect on an individual's ability to work, and therefore should be considered in making a disability determination. *Maxim v. Astrue*, 2010 WL 935600, at *19 (E.D. Cal. Mar. 15, 2015) (citing *Varney v. Sec'y of Health and Human Servs.*, 846 F.2d 581, 585 (9th Cir.). There are two different approaches in the Ninth Circuit to an ALJ's duty to consider medication side effects. *Gonzalez v. Berryhill*, No. 1:15-cv-1132-BAM, 2017 WL 714372, at *6 (E.D. Cal. Feb. 22, 2017). Under the first approach, the ALJ is required to consider all factors that might have a significant impact on an individual's ability to work, including the medication side effects. *Erickson v. Shalala*, 9 F.3d 813, 817-18 (9th Cir. 1993) (citation omitted). Under the second approach, the ALJ's failure to discuss medication side effects constitutes harmful error only if the side effects were a contributing factor in the claimant's inability to work. *Osenbrock v. Apfel*, 240 F.3d 1157, 1164 (9th Cir. 2001). The Court finds no error under either approach.

Contrary to Plaintiff's assertion that the ALJ failed to consider evidence that Plaintiff's morphine dependency caused her recurrent hospitalizations for sepsis, pneumonia, and respiratory failure, as well as drowsiness, chest pain, loss of coordination, confusion, irritability, and nervousness, the ALJ expressly addressed these side effects. (*See* Doc. 14 at 10.) The ALJ acknowledged throughout his decision that Plaintiff was hospitalized for sepsis, pneumonia, and respiratory failure, but he found that these conditions either improved with treatment or completely resolved. (*See, e.g.*, AR 20-21 ("She, otherwise, felt well and was discharged on June 25, 2013, with the following diagnoses: bilateral pneumonia; acute respiratory failure, which had improved; chronic respiratory failure, which required home oxygen; septic shock, which had resolved; hypokalemia, which was supplemented; narcotic dependence . . . .").) The ALJ also

addressed Plaintiff's other side effects, including confusion and lethargy, as more fully set forth above. *See infra* Part V.A.2-3.

In fact, the ALJ directly addressed not only these side effects but also the issue of whether these symptoms were indeed side effects of Plaintiff's morphine dependency. The ALJ noted that Plaintiff stated in a pain questionnaire that she took morphine. (AR 25.) The ALJ cited Dr. Kosuri's treatment notes, indicating that Plaintiff "did take an increased amount of opioids and had been told on some occasions that her [syncope] episodes were related to overdoses, but [her doctors] were not sure." (AR 20.) At the hearing, Plaintiff testified, for example, that she was not receiving treatment for her fainting spells, because her pulmonologist had not yet identified the cause. (AR 52.) Moreover, even if Plaintiff's morphine medication caused these symptoms, Plaintiff has not demonstrated that they would have a significant impact on her ability to work. *See, e.g.*, *Meanel v. Apfel*, 172 F.3d 1111 (9th Cir. 1999) (treating physician's note that "medications to control [claimant's] pain also causes [sic] decreased concentration skills . . . falls short of an informed opinion that [claimant's] pain and diminished concentration skills would significantly interfere with her ability to work"). Consequently, the ALJ did not err in the RFC determination.

## C. The ALJ's Consideration of Dr. Trusnovic's Opinion

Finally, Plaintiff challenges the ALJ's discrediting of treating physician Dr. Trusnovic. The ALJ considered Dr. Trusnovic's treatment of Plaintiff from June 2013 through April 2014, and ultimately afforded "greater weight" to the opinions of evaluating physician Dr. Duggal, and state agency physicians Dr. Frye and Dr. Fast than to the opinion of Dr. Trusnovic. (AR 27.) The ALJ explained that (1) Dr. Trusnovic was treating Plaintiff for only three months when he issued his report, (2) his report did not take into account Plaintiff's recovery and improved symptoms as a result of her oxygen treatment, and (3) his report conflicted with the other medical evidence in the record. (AR 27.) Plaintiff contends that these stated reasons are not specific and legitimate reasons for rejecting Dr. Trusnovic's opinion. (Doc. 14 at 14-16.)

//

//

### 1.    Legal Standard

The ALJ must consider and evaluate every medical opinion of record.  *See* 20 C.F.R. § 404.1527(b) and (c) (applying to claims filed before March 27, 2017); *Madrigal v. Berryhill*, No. CV 16-8714-E, 2017 WL 3120257, at *3 (C.D. Cal. Jul. 21, 2017).    In doing so, the ALJ "cannot reject [medical] evidence for no reason or the wrong reason."  *Madrigal*, 2017 WL 3120257, at *3 (quoting *Cotter v. Harris*, 642 F.2d 700, 706–07 (3d Cir. 1981)).  Nor can the ALJ make his or her own lay medical assessment.  *See Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) (a hearing examiner not qualified as a medical expert should not make his or her own exploration and assessment of a claimant's medical condition) (citation omitted).

Cases in this circuit distinguish between three types of medical opinions: (1) those given by a physician who treated the claimant (treating physician); (2) those given by a physician who examined but did not treat the claimant (examining physicians); and (3) those given by a physician who neither examined nor treated the claimant (non-examining physicians).  *Fatheree v. Colvin*, No. 1:13-cv-01577-SKO, 2015 WL 1201669, at *13 (E.D. Cal. Mar. 16, 2015). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citations omitted); *see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) ("By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." (citing 20 C.F.R. § 404.1527)).  The opinions of treating physicians "are given greater weight than the opinions of other physicians" because "treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual."  *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996) (citations omitted).

### 2.    The ALJ Stated Legally Sufficient Reasons for Rejecting the Medical Opinion of Treating Physician Dr. Trusnovic.

It is uncontested that Dr. Trusnovic treated Plaintiff, and thus is considered a treating physician.  (*See, e.g.*, AR 26.)  "[C]lear and convincing reasons are required to reject the treating doctor's ultimate conclusions . . .  Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing specific and legitimate

reasons supported by substantial evidence in the record for so doing." *Lester v. Chater*, 81 F.3d 821, 830-31 (quotation marks and citations omitted). Nonetheless, "[t]he ALJ need not accept the opinion of any physician . . . if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012) (quoting *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009).

With regard to Plaintiff's residual functional capacity, Dr. Trusnovic opined that Plaintiff's impairments would likely cause her to be absent from work more than four days per month. (AR 388.) The ALJ found that Dr. Trusnovic's opinion was inconsistent with the objective medical evidence in the record and with Plaintiff's improved symptoms as a result of treatment, and that Dr. Trusnovic's treatment relationship with Plaintiff at the time he issued his opinion was limited. (AR 27.) The Court finds the ALJ's reasons to be specific and legitimate.

### a.    Objective Medical Evidence.

As the ALJ indicated, Dr. Trusnovic's opinion of Plaintiff's residual functional capacity was not consistent with that of other examining physicians. Where there are contradicting opinions, as is the case here, the ALJ is charged with resolving the conflict, which he did by affording more weight to the state agency physicians than Dr. Trusnovic. *See Cookson v. Comm'r of Soc. Sec.*, No. 2:12-cv-2542-CMK, 2014 WL 4795176, at 4 (E.D. Cal. Sept. 25, 2014); *see also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) ("The ALJ is responsible for determining credibility, resolving conflicts in the medical testimony, and for resolving ambiguities. We must uphold the ALJ's the ALJ's decision where the evidence is susceptible to more than one rational interpretation."); *Corn v. Astrue*, No. 1:11–cv–00888 AWI GSA, 2012 WL 2798802, at *13 (E.D. Cal. July 9, 2012) ("To the degree there are conflicts in the medical evidence, it is the ALJ's responsibility to resolve such conflicts." (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989))); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[A]n ALJ may discredit treating physicians' opinions that are . . . unsupported by the record as a whole . . . or by objective medical findings." (citations omitted)); *Mitchell v. Astrue*, No. ED CV 09-1258-PLA, 2010 WL 1994695, at *4 (C.D. Cal. May 14, 2010) ("The inconsistency of [the physician's] opinion with the objective [test] results

and the medical evidence as a whole was a legitimate reason supported by substantial evidence for the ALJ to discredit the doctor's opinion." (citing 20 C.F.R. § 404.1527(d)(4))).

Dr. Trusnovic found that Plaintiff would likely be absent from work more than four days per month as a result of her impairments. (AR 388.) However, several months after Dr. Trusnovic issued his opinion, state agency physician Dr. Frye found that Plaintiff was able to perform light work, and that Plaintiff's limitations did not prevent her from performing her past work. (AR 84.) State agency physician Dr. Fast agreed with Dr. Frye. (AR 100.)

Further, as the ALJ noted, pain management specialist Dr. Pantazis found that, although Plaintiff had a diminished range of motion of the lumbar spine and the lower extremities, she had a full range of motion of the upper extremities and cervical spine without tenderness. (AR 27-28; *see also* AR 393-96.) Similarly, with regard to Plaintiff's functional limitations, Dr. Duggal opined that Plaintiff could stand for four to six hours in an eight-hour work day with frequent breaks, that she was able to sit up to six hours in an eight-hour work day, that she needed no assistive device, and that she had only occasional limitations in her ability to manage workplace environmental activities. (AR 27-28; *see also* 495.) Based on these conflicting medical opinions, among the other conflicting medical evidence, the ALJ properly discounted Dr. Trusnovic's opinion regarding Plaintiff's functional limitations.

### b. Improved Symptoms.

The ALJ further cited as a reason for discounting Dr. Trusnovic's opinion the fact that Plaintiff's impairments responded to, and improved with, treatment. (AR 28.) Medical improvement constitutes a clear and convincing reason for rejecting a medical opinion. *Morales v. Astrue*, 300 F. App'x 457, 459 (9th Cir. 2008); *see also Thacker v. Comm'r of Soc. Sec.*, No. 1:11-cv-00613-LJO-BAM, 2012 WL 1978701, at *11 (E.D. Cal. May 31, 2012) (finding evidence that plaintiff's medical condition was improving was a clear and convincing reason for rejecting medical opinion testimony).

During Plaintiff's initial hospitalizations in June 2013, Plaintiff was diagnosed with respiratory failure, hypertension, septic shock, pneumonia, leukocytosis, confusion, and dizziness. (AR 279, 327.) Her symptoms improved and she continued to receive oxygen

treatment. (AR 308-17.) During her first examination with Dr. Trusnovic, he found improvement in Plaintiff's symptoms related to pneumonia, respiratory failure, sepsis, and renal failure. (AR 377, 381.) Over the subsequent months, Dr. Trusnovic continued to note improvements in Plaintiff's symptoms as a result of treatment and medication. (*See*, *e.g.*, AR 365, 373, 431.) Pain management specialist Dr. Pantazis found continued improvement, as well, noting that, as a result of epidural steroid injections, Plaintiff experienced 50 percent relief from her lumbar spine and leg pain, and increased activity. (*See*, *e.g.*, AR 408, 439, 444.) Accordingly, the ALJ permissibly cited Plaintiff's improved symptoms as contributing to his reason for discrediting Dr. Trusnovic's opinion.

### c. Brief Treatment Relationship.

Finally, the ALJ pointed to Dr. Trusnovic's three-month relationship with Plaintiff as a basis for rejecting Dr. Trusnovic's opinion. (AR 27.) "[T]he length of the treatment relationship and the frequency of examination by the treating physician[,] and the nature and extent of the treatment relationship between the patient and the treating physician" are specific and legitimate reasons to reject a treating physician. *Garcia v. Colvin*, 1:13-cv-0008 GSA, 2014 WL 1091724, at *8 (E.D. Cal. Mar. 18, 2014) (citing 20 C.F.R. § 404.1527(c)(2)(i)-(ii); *Carrigan v. Colvin*, 2014 WL 1757208, at *8 (E.D. Cal. Apr. 30, 2014).

As the ALJ noted, the length of Dr. Trusnovic's treating relationship with Plaintiff prior to Dr. Trusnovic's residual functional capacity findings was very short—approximately three months. In that three-month period, Dr. Trusnovic saw Plaintiff only four times. *See*, *e.g.*, *Payne v. Colvin*, No. 1:12-cv-1764-SMS, 2014 WL 348455, at *6-7 (E.D. Cal. Jan. 31, 2014) (finding that only two visits to doctor was a sufficient to discount that doctor's opinion); *Carrigan*, No. 1:13-cv-00458-SKO, 2014 WL 1757208, at *8 (finding a one-month relationship prior to issuing opinion, and a total of three visits over seven months, to be sufficient reason for ALJ to discredit doctor's opinion); *Baines v. Astrue*, No. EDCV 09-1121-MLG, 2011 WL 3759040, at *5 (C.D. Cal. Aug. 25, 2011) (finding two visits prior to issuing opinion to be sufficient reason to discredit doctor's opinion); *Wright v. Astrue*, 2009 WL 2849006, at *4 (C.D. Cal. Aug. 31, 2009) (finding four visits, including outpatient treatment, over a five month

period to be sufficient reason for ALJ to discredit doctor's opinion). Given this brief treatment relationship, the ALJ's decision to discredit Dr. Trusnovic's opinion is well supported.

In summary, the Court finds that the ALJ's stated bases for discrediting Dr. Trusnovic's opinion regarding Plaintiff's residual functional capacity are supported by substantial evidence. Consequently, reversal of the ALJ's decision on this ground is not warranted.

## VI. CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is, therefore, AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Diane L. Stoffan.

IT IS SO ORDERED.

Dated:   **March 14, 2018**                            /s/ *Sheila K. Oberto*

                                                UNITED STATES MAGISTRATE JUDGE